UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREDERICK J. MAHONEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-2327 |
| | § | |
| FARMERS INSURANCE EXCHANGE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion to Decertify FLSA Collective Action

(Doc. No. 85).  Upon considering the Motion, all responses thereto, and the applicable law, the

Court finds that Defendant's Motion to Decertify FLSA Collective Action must be denied.

## I.     BACKGROUND

This case is brought by Plaintiff Frederick J. Mahoney ("Plaintiff" or "Mahoney"), on

behalf of himself and other similarly situated employees, under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201. Mahoney alleges that Farmers Insurance Exchange ("Defendant" or

"Farmers") subjected him and other employees to policies and practices that required employees

to regularly work in excess of forty hours per week without overtime compensation.[1]

Mahoney worked for Farmers as an Auto Physical Damage claims representative ("APD

CR" or "CR") in Albuquerque, New Mexico and Sugar Land, Texas. APD CRs are responsible

for investigating and adjusting automobile insurance claims on behalf of Farmers. APD CRs

---

[1] Apart from Mahoney, there are currently seventeen opt-in plaintiffs participating in this collective action. Six of the opt-in plaintiffs worked at the Sugar Land, Texas office (Mark Austin ("Austin"), Joseph Cook ("Cook"), John Fudge ("Fudge"), Kyle McElveen ("McElveen"), Clint Mumford ("Mumford"), and Jared Smith ("Smith")). Seven of the opt-in plaintiffs worked at the Albuquerque, New Mexico office (Jerry Barboa ("Barboa"), Eric Garcia ("Garcia"), Colton Jones ("Jones"), Erick Ortiz ("Ortiz"), Clarissa Nanawa ("Nanawa"), Robert Palm ("Palm"), Todd Skiff ("Skiff"), and Kenneth St. Germain ("St. Germain")). Three of the opt-in plaintiffs worked in the Lubbock, Texas office (Andy Bilbrey ("Bilbrey"), Terry Cash ("Cash"), and Charla Novak ("Novak")).

generally work "in the field" to inspect vehicles and estimate repairs. Upon receipt of a claim, an APD CR first reviews the insured's file and confirms that coverage exists.[2] Next, the APD CR makes "first contact" with the insured to discuss: (1) facts concerning the loss; (2) a confirmation of the damage; (3) an explanation of coverage; (4) the need for a rental car; and (5) other applicable policy benefits.[3] The APD CR also schedules a vehicle inspection with either the insured or the repair facility, depending on the vehicle's location.[4] The APD CR then travels to the vehicle's location to conduct an appraisal of the damage and to estimate the amount of repairs.[5] The APD CR visually inspects the damage, takes photographs of the damage, and prepares a repair estimate.[6] After completing the estimate, the APD CR provides a copy to the customer and to the repair shop, along with an explanation of the anticipated repair.[7] Finally, the APD CR verifies ownership of the vehicle and issues a check to the customer.[8] Under Farmers' claim adjusting guidelines, claims are to be paid on the day of inspection and then closed—a policy known as "one and done."[9] Depending on the extent of the damage and type of claim, an inspection and estimate takes between one and three hours to complete.[10] After the inspection is completed, the APD CR travels to the next location and begins a new claim.

As part of the claims adjusting process, APD CRs are expected to perform a multitude of tasks (also known as "activities") in addition to vehicle inspection, including answering the phone inquiries, obtaining customer service surveys, arranging rental cars for the insureds, tracking

---

[2] Auto Physical Damage Field Claims Handling Guidelines at 3, Ex. S to Resp. to Mot. to Decertify [hereinafter APD Guidelines]; Cook Dep. 41:15-24.
[3] APD Guidelines at 4.
[4] APD Guidelines at 4.
[5] APD Guidelines at 10.
[6] APD Guidelines at 6-7; McElveen Dep. 83:10-19.
[7] APD Guidelines at 4-5.
[8] APD Guidelines at 14.
[9] APD Guidelines at 14; Austin Dep. 51:23-24; Barboa Dep. 12:24-13:1; Cook Dep. 42:24-43:8; Fudge Dep. 23:12-15; McElveen Dep. 46:7-8.
[10] McElveen Dep. 50:1-52:8.

down vehicle parts, securing approval of payments from their supervisors, and communicating with their supervisors about claims.[11] APD CRs are also expected to document their claim-related activities, such as communication with the insureds, a description of their decision-making process, photographs, written communication, and estimates, using software called Customer Restoration Network ("CRN").[12]

Despite the "one and done" policy, APD CRs are frequently unable to close a claim on the day of inspection due to follow-up work with insureds and repair shops, managing rental car arrangements, and supplemental claims.[13] Supplemental claims involve additional repair work to the vehicle that is not included in the original estimate.[14]

In the second quarter of 2008, APD CRs in Albuquerque, Sugar Land, and Lubbock began using software called ServicePower, which schedules vehicle inspection appointments for APD CRs. Prior to the implementation of ServicePower, each APD CR was assigned several claims each day.[15] For each claim, the APD CR bore responsibility for making first contact with the insured within a certain time frame and scheduling the vehicle inspection at a body shop, wrecking yard, or the insured's residence over the next several days.[16] The APD CR also scheduled his or her own lunch and rest breaks throughout the workday.

After ServicePower's implementation, APD CRs have their vehicle inspection appointments scheduled and sent to them by ServicePower.[17] ServicePower sends (or "drips") the first claim of the day to the APD CR the afternoon before or day of the appointment through his

---

[11] Bilbrey Dep. 44:18-45; Cook Dep. 44:5-45:7; McElveen Dep. 84:21.
[12] APD Guidelines at 2; Bilbrey Dep. 44:18-45.
[13] Cook Dep. 43:9-45:7; Fudge Dep. 23:16-20.
[14] Austin Dep. 52:9-19.
[15] Bilbrey Dep. 89:19-90:11; Cash Dep. 43:14-15; Palm Dep. 44:20-23.
[16] Cash Dep. 42:11-43:15 (stating that pre-Service Power, he had 24 hours to make first contact with the insured).
[17] Mahoney Dep. 139:19-21; St. Germain Dep. 68:9-22.

or her laptop.[18] When ServicePower drips an appointment to an APD CR, it allots a certain portion of time for travel to the location of the automobile, a certain amount of time for vehicle inspection at the designated location, and time for administrative tasks.[19] After the claim is dripped, the APD CR presses the "Received" button on ServicePower to acknowledge receipt of the claim.[20] The APD CR makes contact with the insured prior to traveling to the vehicle's location.[21] When he or she begins traveling to the vehicle, the APD CR clicks on the "Travelling" button.[22] When the APD CR arrives at his or her destination, he or she clicks the "Onsite" button.[23] Upon completing the inspection, the APD CR clicks the "Finished Onsite" button in ServicePower, which then assigns the APD CR another claim.[24] If an APD CR needs more than the allotted time to complete the claim, he or she must call his or her supervisor or dispatcher to request additional time.[25]

Because ServicePower knows the location of the APD CR, it can assign claims based on geographic proximity. In addition, ServicePower knows the time of day and will not assign another claim to an APD CR after 4:00 p.m.[26] If an APD CR finishes a vehicle inspection before the end of his or her shift, the APD CR uses the remaining time in his or her shift for administrative tasks.[27] Finally, ServicePower blocks out a period of time mid-day for the APD CR's lunch break.[28]

---

[18] Cook Dep. 23:12-24:11; Fudge Dep. 93:17-24; Mahoney Dep. 140:12-14; St. Germain Dep. 69:4-7.
[19] Mahoney Dep. 169:8-17; Palm Dep. 42:12-45:19; St. Germain Dep. 77:1-78:25.
[20] ServicePower/ServiceMobility Guidelines at 3, Ex. V to Resp. to Mot. to Decertify [hereinafter ServicePower Guidelines].
[21] Cash Dep. 43:14-44:12; Mahoney Dep. 140:15-23; St. Germain Dep. 68:23-25.
[22] ServicePower Guidelines at 3.
[23] ServicePower Guidelines at 3.
[24] ServicePower Guidelines at 3; Cook Dep. 23:3-5; St. Germain Dep. 26:15-27:10.
[25] Goble Decl. ¶ 8; Tillman Decl. ¶ 7.
[26] Fudge Dep. 93:1-6; Mahoney Dep. 160:10-161:4; Palm Dep. 123:20-124:9.
[27] Fudge Dep. 93:7-12; Mahoney Dep. 162:2-9; Palm Dep. 124:16-25.
[28] Goble Decl. ¶ 8; Tillman Decl. ¶ 7.

APD CRs have a Farmers-issued laptop equipped with wireless Internet access. APD CRs are instructed to conduct a remote synchronization ("remote sync") of their laptops to the Farmers' network in order to transfer information saved locally on their computer on to the network.[29]

Farmers' official policy requires APD CRs to record accurately all of their hours worked and prohibits them from working off-the-clock.[30] Farmers' official policy also requires APD CRs to take lunch and rest breaks each day during which no work may be performed.[31] In order to work overtime, APD CRs are required to obtain pre-approval of the overtime hours from their supervisor.[32] If an APD CR performs overtime work without pre-approval, he or she will be paid for the overtime, but may also be subject to disciplinary action for violating the pre-approval policy.[33]

Despite Farmers' official overtime policy, Mahoney alleges that he and other APD CRs routinely worked off-the-clock overtime hours for which they were not compensated properly. Upon Mahoney's motion, the Court conditionally certified a collective action composed of the following individuals:

> "All current and former non-exempt claims representatives employed by Farmers in the Albuquerque, New Mexico office and the Sugar Land, Texas office during the three-year period preceding the filing of this complaint."

Opt-in plaintiffs who worked for Farmers in Sugar Land, Albuquerque, and also Lubbock, Texas have joined the lawsuit. Farmers now moves to decertify the collective action. The motion has been briefed and is ripe for disposition.

## II.   LEGAL STANDARD

---

[29] Barboa Dep. 33:6-13; Fudge Dep. 113:21-114:20.
[30] Goble Decl. Ex. C.
[31] Goble Decl. Ex. C.
[32] Bilbrey Dep. 20:14-17; Goble Decl. ¶ 22 & Ex. C.
[33] Goble Decl. ¶ 22 & Ex. C.

Section 16(b) of FLSA provides that a person may maintain an action on "behalf of himself . . . and any other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). A representative action brought pursuant to this provision follows an "opt-in" rather than an "opt-out" procedure. *See Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90-91 (2003).

In *Mooney*, the Fifth Circuit approved of the two-stage approach outlined in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), to determine whether plaintiffs in a FLSA collective action are "similarly situated." *Mooney*, 54 F.3d at 1213. At the first stage – the "notice" stage – conditional class certification rests on a "modest" showing by the plaintiffs that they are similarly situated to the putative class in that they were together "victims of a single decision, policy or plan . . ." *Id.* at 1214 n.8. A plaintiff must make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit. *See Prater v. Commerce Equities Mgmt. Co.*, 2007 WL 4146714, at *4 (S.D. Tex. Jan. 24, 2007). A plaintiff can establish that other individuals are similarly situated by identifying a "factual nexus between their situation and the situation of other current and former employees."

At the second stage—the "decertification" stage—the plaintiff must prove that the opt-in plaintiffs are similarly situated to the named plaintiff. *See Mooney*, 54 F.3d at 1214. Because the parties have been able to conduct discovery, the similarly situated inquiry at the second stage is much more stringent. *Harris v. FFE Transp. Servs., Inc.*, No. 3:05-cv-007-P, 2006 U.S. Dist.

LEXIS 51437, *7-*8 (N.D. Tex. May 15, 2006). If the court determines that the opt-in plaintiffs are similarly situated, the representative action may proceed. *Mooney*, 54 F.3d at 1214. If they are not similarly situated, the class is decertified, the opt-in plaintiffs are dismissed without prejudice, and the original named plaintiffs may proceed only with their own claims. *Id.*

While the plaintiffs must show that they are "similarly situated," this does not mean they must establish they are "identically situated." *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 U.S. Dist. LEXIS 12441, *15 (E.D. La. July 1, 2004) (citing *Crain v. Helmerich and Payne Int'l Drilling Co.*, No. 92-0043 1992 U.S. Dist. LEXIS 5367, *2 (E.D. La. 1992)). Instead, the question is if there is "a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice.]" *Heagney v. European Am. Bank,* 122 F.R.D. 125, 127 (E.D.N.Y. 1998); *see also Helmerich,* 1992 U.S. Dist. LEXIS 5367 at *2. Decertification is proper if "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Burt v. Manville Sales Corp.,* 116 F.R.D. 276, 277 (D. Colo. 1987); *see also Helmerich,* 1992 U.S. Dist. LEXIS 5367 at *2. In fact, "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007). The court considers several factors at the decertification stage, including: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* at *10 (citing *Mooney,* 54 F.3d at 1213 n.7).

**III.   ANALYSIS**

Mahoney is less than precise in identifying the specific policy or practice of Farmers that ties the opt-in plaintiffs together and resulted in their working off-the-clock overtime. Among his allegations and arguments, Mahoney appears to characterize the following policies and practices as resulting in "off-the-clock" overtime: (1) Farmers' "one and done" scheduling policy and demanding performance objectives; (2) Farmers' practice of "frowning on" overtime requests; and (3) Farmers' practice of requiring APD CRs to remotely synchronize their computers.

As to all of Mahoney's allegations, Farmers contends that the opt-in plaintiffs operated under highly varied factual and employment settings, including different offices, different managers, different work schedules and different activities performed during their purported off-the-clock hours. In addition, Farmers argues that its defenses to each opt-in plaintiff's claims would be highly individualized. Finally, Farmers contends that, due to the highly individualized nature of the claims and defenses and the inability to use representative testimony, fairness and procedural concerns militate against collective treatment.

Mahoney responds to Farmers' arguments by proposing bifurcation between the liability and damages phases of trial. Mahoney also proposes dividing the plaintiffs into sub-classes according to the office in which they worked, in order to alleviate some of the concerns regarding disparate factual and employment settings and the use of representative testimony. Since our overarching inquiry must focus on whether the class members are "similarly situated," we will first determine whether Mahoney has demonstrated that common policies and practices existed that resulted in the alleged FLSA violations.

A.      "One and Done" Scheduling Policy and Demanding Performance Standards

As evidence that the plaintiffs are similarly situated, Mahoney focuses on the fact that all APD CRs performed the same job and were paid the same way. They all worked pursuant to the

same APD mandatory claims processing guidelines and all adjusted insurance claims the same way. After the implementation of ServicePower, they all received claims through the same system, which failed to allot additional time to complete administrative work on open claims unless requested. In addition, they all operated under the same overtime and administrative time policies. Finally, they all were evaluated in the same manner, based, in part, on a measure known as an "efficiency rating" that could affect their compensation. Failure to complete their tasks in the time allotted could result in discipline or termination. As a result of these policies and practices, APD CRs worked before and after shifts and through lunch and rests breaks. Some opt-in plaintiffs were instructed by their supervisors to use ServicePower buttons and CRN in a way as to avoid notice by Farmers of the overtime hours.

Despite the many similarities among the APD CRs, we cannot conclude that they were all subjected to the "one and done" policy or demanding performance objectives based on the evidence presented thus far. First, the APD CRs did not all perform the same duties.[34] Most of the opt-in APD CRs performed work "in the field" and carried out the claims handling procedures described above.[35] However, some of the opt-in CRs worked at "drive-through" centers where they processed insurance claims for vehicles that were brought into the centers.[36] Other opt-in plaintiffs were "inside office claims representatives" or CRs assigned to a particular type of claim

---

[34] One opt-in plaintiff, Mark Austin, bases his claim solely on overtime hours he allegedly worked during his training to become an APD CR. Austin Dep. 39:18-21. He is not "similarly situated" to the other APD CRs because he never worked under ServicePower's strict time requirements.

[35] Farmers argues that APD CRs who worked in the field had different shifts, some beginning as early 7:30 a.m. and others beginning at 9:30 a.m. and had different ways of carrying out their work in the field. We view the differences among work routines as inconsequential in determining decertification and instead focus on whether the actual job functions performed are similar among the APD CRs. *See Brennan v. Qwest Comm'ns Int'l, Inc.*, Case No. 07-2024, 2009 U.S. Dist. LEXIS 47898, *9 (D. Minn. June 4, 2009) (viewing discrepancies in the particular manner of how technicians performed substantially similar tasks during the day as inconsequential).

[36] Austin Dep. 40:22-41:5 (worked in drive-through center); Skiff Dep. 54:6-10 (describing half his time as spent working in drive-in center).

(such as theft claims).[37] These differences are material because they indicate that the APD CRs were not all working under the "one and done" policy or subject to the same demanding performance objectives.

Second, the APD CRs are not similarly situated with respect to the "one and done" scheduling policy. At oral argument, Mahoney's counsel stated that the plaintiffs' claims included pre-ServicePower off-the-clock work. However, some of the APD CRs worked for Farmers only prior to the implementation of Service Power,[38] while others worked both pre- and post-implementation.[39] The APD CRs who worked pre-ServicePower were free to set their own schedules and were not subject to the "one and done" policy and its attendant time pressures.[40] Moreover, the pre-ServicePower regime appears to have been decentralized, with APD CRs in different offices subject to different expectations regarding the amount of time in which they were required to process claims.[41]  In addition, pre-ServicePower, the workloads among offices and among APD CRs varied significantly. Barboa describes completing seven to nine claims each day pre-ServicePower.[42] Jones received ten claims per day pre-ServicePower.[43] Mahoney received anywhere from four to twelve claims per day pre-ServicePower.[44] Mumford typically

---

[37] Novak Dep. 47:12-24 (worked as office claims representative for approximately four months in 2008); Skiff Dep. 62:12-21 (during two months in 2007, worked exclusively in the office doing fax-in claims).
[38] McElveen Dep. 23:9-13, 120; Mumford Dep. 61:9-10; Skiff Dep. 30.
[39] Barboa Dep. 28:8-30:1; Cash Dep. 6:18-22; Cook Dep. 42:12-15; Fudge Dep. 71:6-9; Jones Dep. 108:21-23; Mahoney Dep. 67:9-17; Novak Dep. 41:24-42:2; Palm Dep. 45:20-23; St. Germain Dep. 25:2-8.
[40] Barboa Dep. 90-92 (describing no fixed cycle time pre-ServicePower but just a general mandate to keep claim cycle time as low as possible); Bilbrey Dep. 89-90 (free to set his own schedule and work his assigned claims however he wanted to); Cook Dep. 42:12-25 ("one and done" policy implemented after ServicePower).
[41] *Compare* Barboa Dep. 90-92 (in Albuquerque, operated under a general mandate to keep claim cycle time as low as possible); Mahoney Dep. 82:8-10, 106:15-17 (before ServicePower, he met with insureds as early as 6:00 a.m. and operated under 48-hour cycle time); McElveen Dep. 92:20-22 (in Sugar Land, claim had to be closed within three days of receipt) *with* Bilbrey 89-90 (in Lubbock, was free to work his claims "anytime" he wanted to); Cook Dep. 42:12-25 (in Sugar Land, was free to take a few days to finish a claim pre-ServicePower); Jones Dep. 109:2-7 (in Albuquerque, was free to do claims the same day or the next day pre-ServicePower); Novak 42:12-14 (in Lubbock, had more leeway in setting the appointments and working the claims); Palm Dep. 47-49, 69 (in Albuquerque, could schedule appointments the same week or next week after receiving a claim and operated under a five day cycle time).
[42] Barboa Dep. 12:7-13:14.
[43] Jones Dep. 108:23-109:7.
[44] Mahoney Dep. 108:13-21.

received six to eight claims per day.[45] As for the APD CRs who worked post-ServicePower, they too report a variety of experiences with respect to their workload. Some state that they worked less after ServicePower's implementation,[46] while others state that they work more after ServicePower.[47] Therefore we cannot conclude that the APD CRs are similarly situated to each other considering the wide range of factual circumstances and employment settings involved in their pre-ServicePower and post-ServicePower work.

Third, many of the similarities that Mahoney identifies among the plaintiffs are similarities in the nature of the FLSA violation rather than a common policy or plan. For example, Mahoney notes that all opt-in plaintiffs worked through their lunch and rest breaks. Although this may be true, all it highlights is that plaintiffs were performing off-the-clock work but does not tie this off-the-clock work to a common policy or plan other than simply having too much work to do. As another example, Mahoney submits evidence that all opt-in plaintiffs performed off-the-clock work before or after their scheduled shifts.[48] Once again, even if true, this evidence does little to identify the common policy or plan requiring the plaintiffs to work off-the-clock.

As a result of these differences among the plaintiffs, we cannot conclude that they are similarly situated in the sense that they were all victims of the one and done policy or the demanding performance objectives. There is evidence that all opt-in plaintiffs performed

---

[45] Mumford Dep. 34:20-21.
[46] Barboa Dep. 28:16:30:1 (works less after ServicePower because ServicePower performs many of the tasks he previously had to do himself); Cash Dep. 46-27 (worked less after ServicePower because ServicePower set up appointments with customers); Palm dep. 125;18-22 (did not put in as much after-hours work post-ServicePower).
[47] St. Germain Dep. 69:15-25 (post-ServicePower, workloads became overwhelming).
[48] We do not view as material the differences in the tasks that each plaintiff performed during their alleged overtime hours. *See Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008) ("That ASMs did not perform exactly the same duties off-the-clock does not undermine the conclusion that the putative class is similarly situated.").

overtime work because they had too many tasks to complete within their scheduled shifts.[49] However, the opt-in plaintiffs have failed to demonstrate that they all worked under the one or done policy, or, in the case of the performance objectives, that these gave rise to the high workloads. Dividing the plaintiffs into sub-classes according to office does not erase the differences among the plaintiffs described above. Bifurcation into liability and damages phases of the trial similarly is insufficient to solve the primary concern over a lack of an identifiable common policy or plan. Finally, the use of representative testimony would be highly difficult considering the variety among the opt-in plaintiffs' experiences pre- and post-Service Power and the different tasks performed in the field versus in drive-in centers.

## B.      Pressure To Work "Off-the-Clock"

Mahoney argues that Farmers' negative attitude towards overtime requests and pressure not to take overtime resulted in "off-the-clock" work. Specifically, if an APD CR requested overtime, it was an indication that they were not efficient, had "time management" issues, or a poor attitude. If an SCR did request overtime, they were allowed less overtime than the amount requested. Sometimes requests for overtime were denied outright.

### 1.      Disparate Factual and Employment Settings

It is undisputed that Farmers has in place an official policy that requires APD CRs to report all time worked and prohibits off-the-clock work. In addition, Farmers' official policy is to require APD CRs to receive pre-approval prior to incurring overtime hours. Even if the APD CR does not receive pre-approval of overtime, Farmers' policy is to compensate the APD CR for the overtime. However, if the APD CR fails to receive pre-approval prior to working the overtime

---

[49] We view as immaterial the opt-in plaintiffs' respective motivations for working off-the-clock. *See Brennan*, 2009 U.S. Dist. LEXIS at *14 ("The reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.") (quoting *Reich v. Dep't of Conservation & Natural Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994)).

hours, the APD CR is subject to discipline. In light of Farmers' official policy, we cannot accept Mahoney's allegation that Farmers had a policy of not paying employees for overtime work. *See Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 962  (W.D. Mich. 2009). Rather, we must determine whether there is a factual basis for Mahoney's claim that Farmers' common or uniform practice was not to follow its formal, written policy. *Id.*; *see also Thompson v. Speedway SuperAmerica, LLC*, No. 08-CV-1107, 2009 U.S. Dist. LEXIS 3816, *2 (D. Minn. Jan. 20, 2009) (absent published corporate policy not to compensate for work performed, plaintiffs should "establish a colorable basis that such a policy-to-violate the policy exists").

Here there is substantial evidence that Farmers' supervisors "frowned upon" overtime requests. For example, Barboa in Albuquerque was told by his supervisor Brad Quiring that Farmers could not pay Barboa for the overtime incurred even though Quiring knew that Barboa had a certain number of tasks to perform.[50] Barboa's experience with supervisors' frowning upon overtime is mirrored by other APD CRs in Albuquerque,[51] in Lubbock,[52] and in Sugar Land.[53] Bilbrey and other APD CRs were told that, if they asked for overtime, they would be seen as having time management issues or a behavior problem, when, in fact, there were simply too many claims for the allotted time.[54] Similarly, in Lubbock, all supervisors (including Danny Knight and Greg Williams) acknowledged that APD CRs didn't have enough time to do the work they were

---

[50] Barboa Dep. 60:10-61:25, 62:13-24.
[51] Jones Dep. 25:15-20, 45:19-25 (in Albuquerque, requests for overtime were frowned upon); Mahoney Dep. 56:3-10 (in Albuquerque, was told by Brad Quiring that he needed to watch his overtime); Skiff Dep. 91:20-25 (in Albuquerque, received more complaints from Tracy Counasse after logging overtime).
[52] Bilbrey Dep. 33:13-21.
[53] Cook Dep. 25 (in Sugar Land, overtime was frowned upon); Fudge Dep. 129:18-21 (in Sugar Land, overtime was generally discouraged); Mahoney Dep. 41:3-4.
[54] Bilbrey Dep. 33:9-34:19 (Lubbock); Cook Dep. 37:20-38:2 (in Sugar Land, requesting overtime was an indicator that they were not doing their job efficiently); Fudge Dep. 128:17-23 (in Sugar Land, requesting overtime would negative impact performance review); Mahoney Dep. 42:5-9 (in Sugar Land, Mike Couvillion said that requesting overtime was seen as inefficient and unproductive).

assigned within the regular workweek.[55] The Lubbock supervisors told APD CRs to do what they needed to do to get the work done.[56] In Sugar Land, supervisors (Felicia Butler) similarly acknowledged that APD CRs were overworked, but told them that they should just do their work.[57]

Opt-in plaintiffs in Sugar Land, Lubbock, and Albuquerque often had to negotiate a lower number of overtime hours with their supervisors.[58] At other times, opt-in plaintiffs in Albuquerque and Lubbock were told that no overtime hours were allowed.[59] APD CRs who were caught doing off-the-clock work in Albuquerque were suspended.[60] The suspensions had the effect of convincing APD CRs not to log their overtime hours rather than convincing APD CRs to cease working off-the-clock.[61] APD CRs in Lubbock who were caught making phone calls in the morning or other off-the-clock work were counseled not to do so and warned of the possibility of

---

[55] Bilbrey Dep. 89:1-5; Cash Dep. 30:21-31:13; Novak Dep. 16:12-23, 36:20-21.

[56] Novak Dep. 15:4-9, 36:20-21 (in Lubbock, was told by Greg Williams to do what he needed to do to get the work done).

[57] Fudge Dep. 128:3-8.

[58] Barboa Dep. 61:10-12 (in Albuquerque, was told by Quiring that he could not put "that much" overtime down); Palm Dep. 66:4-11 (in Albuquerque, supervisors would approve small amounts of overtime insufficient to complete work); McElveen Dep. 36:2-38:8, 147:1-11 (in Sugar Land, negotiated with supervisor Tharon Williams about the number of overtime hours given for overtime work, but was never given enough overtime hours); Mumford Dep. 40:4-42:19 (in Sugar Land, was required to negotiate with Tharon Williams about overtime hours and only received a lesser amount than what was needed); Novak Dep. 13:2-20 (in Lubbock, negotiated with supervisors Danny Knight and Greg Williams over the amount of overtime that would be given to complete work); Cash Dep. 26:13-27:3 (in Lubbock Greg Williams gave "some" of the overtime requested).

[59] Barboa Dep. 62:24-69:2 (in Albuquerque, was told by Quiring that Steve Tillman had put a stop to overtime hours); Jones Dep. 78:23-79:23 (in Albuquerque, was told by Steve Tillman that no overtime hours would be approved); Palm Dep. 64:20-69:6 (in Albuquerque, was told by Quiring and Eric Foutz that Steve Tillman had put a stop to overtime approval for periods of time); Skiff Dep. 64:13-65:1 (in Albuquerque, was told by Quiring that he would not approve overtime); St. Germain Dep. 63:22-64:3, 65:17-66:2 (in Albuquerque, was told by Quiring from supervisors that there would be no overtime approved); Bilbrey 33:9-11, 34:17 (in Lubbock, was told by supervisors that "state director" had put a stop to overtime hours).

[60] Barboa Dep. 26:8-27:3 (APD CRs were suspended in 2009 for working off-the-clock); Palm Dep. 51:5-17 (was suspended for one week for working unauthorized overtime); St. Germain Dep. 99:22-100:14 (was suspended for one week for working off-the-clock).

[61] Barboa Dep. 86:1-20 (in Albuquerque, stopped logging lunchtime phone calls due to fear of suspension);

disciplinary action and termination.[62] In Sugar Land, Mahoney ostensibly was terminated for sending an email at 5:30 p.m.[63]

As a result of the informal policies and practices discouraging overtime requests and the disciplinary action meted out to those caught doing work off-the-clock, APD CRs found ways to perform off-the-clock work with the understanding and, in some cases, at the explicit instruction of their supervisors. In Albuquerque, supervisors (Eric Foutz and Mark Martinez) told APD CRs that, as a result of negative attitude towards overtime and the decision not to approve overtime hours, APD CRs would have to meet their goals without entering overtime hours.[64] In Lubbock, the unstated understanding drawn by the APD CRs from their supervisors' statements was that they should work "off-the-clock" to finish their duties.[65] Indeed, both supervisors in Albuquerque and Lubbock showed APD CRs how to enter activities in the claims software, open emails, and work through lunch without leaving a time stamp.[66]

Farmers argues that the variety of supervisors under which the APD CRs worked in the three offices demonstrates that each APD CR was subject to the supervisors' respective practices and attitudes towards overtime. The opt-in plaintiffs were supervised by at least two supervisors each during their employment. For example, in Sugar Land, Cook testified that supervisors were

---

[62] Bilbrey Dep. 86:10-25 (in Lubbock, was told by supervisor Danny Knight not to make phone calls before 8:00 a.m.); Cash Dep. 55:13-59:4 (in Lubbock, was counseled for off-the-clock work and told that overtime without pre-approval could result in termination); Novak Dep. 17:18-18:9, 33:22-23 (in Lubbock, supervisors made clear that being caught doing off-the-clock work would result in disciplinary action).

[63] Mahoney Dep. 63:3-9.

[64] Jones Dep. 80:21-87:16, 46:19-47:2, 54:20-56:13, 69:11-71:11 (in Albuquerque, was told by supervisors Eric Foutz and Mark Martinez not to follow Farmers' policy of recording all hours worked).

[65] Cash Dep. 31:11-12, 55:2-12 (upon informing supervisor Greg Williams that he was working through his lunch break, Williams told him that he should take his lunch break but also that he knew Cash did not have enough time to do so); Novak Dep. 15:10-21, 18:20-19:8.

[66] Jones Dep. 30:23-32:12 (in Albuquerque, was instructed by Eric Foutz and Mark Martinez how to work off-the-clock without detection); Palm Dep. 59:23-63:7 (in Albuquerque, was instructed by Eric Foutz and Mark Martinez how to work through lunch hour); Bilbrey Dep. 74:20-24 (in Lubbock, supervisor Jody Wright told Bilbrey how to work in CRN after-hours without leaving a time stamp); Cash Dep. 27:14-16 (in Lubbock, supervisor Greg Williams instructed Cash that, if he had to work off-the-clock, he should avoid entering time-stamped activities).

never allowed to deny overtime.[67] In Lubbock, different APD CRs had different opinions as to the pressure they experienced from the same supervisors.[68] Further, Farmers points out that some supervisors approved overtime and administrative time.[69] We believe that these differences are minimal and are eclipsed by the testimony of APD CRs from all three offices, regardless of supervisor, regarding extremely similar pressures and practices from overlapping supervisors regarding overtime requests.[70] *Compare Wilks v. The Pep Boys*, No. 3:02-0837, 2006 U.S. Dist. LEXIS 69537, *20-*21 (M.D. Tenn. Sept. 26, 2006) (plaintiffs presented significant evidence that they were forced to work overtime due to supervisor pressure), *with Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 U.S. Dist. LEXIS 5002, *24 (S.D. Tex. Jan. 24, 2007) (denying conditional certification where plaintiff could not demonstrate that policy discouraging overtime affected "meaningful number" of employees); *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 279 (N.D. Tex. 2008) (some plaintiffs never worked off-the-clock); *Basco v. Wal-Mart Stores, Inc.*, No. 00-3184 Section "K"(4), 2004 U.S. Dist. LEXIS 12441, *19 (E.D. La. July 1, 2004) (evidence of off-the-clock work was "extremely anecdotal—one manager requiring it as oppose[d] to all, perhaps once or twice during the course of a plaintiff's work"). Indeed, the fact that Farmers' supervisors instructed plaintiffs not to report overtime, or to report less overtime than what was needed, suggests that the practice was not isolated. *See Kautsch v. Premier*

---

[67] Cook Dep. 39:21-40:1; Mumford Dep. 47:20-24 (in Sugar Land, was never told that no overtime was allowed).

[68] Bilbrey Dep. 54:15-21 (in Lubbock, both supervisors Danny Knight and Greg Williams had the same attitude towards overtime—i.e., they did not approve it); Novak Dep. 11:11-12 (in Lubbock, was easier to obtain approval for overtime hours from Greg Williams than Danny Knight).

[69] Administrative time is time given to APD CRs within their regularly scheduled shifts during which they can focus exclusively on administrative tasks. *See* Fudge Dep. 76:14-16. For the purpose of the decertification inquiry, requests for administrative time are treated the same as requests for overtime because both are used to complete administrative tasks that the APD CR can not complete if he or she has been processing claims all day. *See* Bilbrey Dep. 105:20-22; Jones Dep. 74:5-10; Mahoney Dep. 184:9-186:11; McElveen Dep. 38:6-39:5; Palm Dep. 64:4-19; St. Germain Dep. 98:14-99:2.

[70] Farmers has also submitted declarations from other APD CRs who worked in the Sugar Land and Albuquerque offices with respect to off-the-clock work, pressure from supervisors, remote synchronization and other items, in an attempt to controvert the experiences of the opt-in plaintiffs. These declarations are not sufficient to persuade us that testimony from the opt-in plaintiffs lack veracity or that the opt-in plaintiffs are not similarly situated.

*Comm'ns, Inc.*, No. 06-cv-04035-NKL, 2008 U.S. Dist. LEXIS 7219, *7 (W.D. Mo. Jan. 31, 2008) (evidence that supervisors instructed employees not to report overtime supports inference that employer maintained top-down, centralized policy regarding overtime).

Case law holding that "off-the-clock" claims are inappropriate to adjudicate through collective actions have involved nationwide classes. *See Velasquez v. HSBC Finance Corp.*, 266 F.R.D. 424, 426 (N.D. Cal. 2010); *Saleen*, 2009 U.S. Dist. LEXIS at 2; *Thompson*, 2009 U.S. Dist. LEXIS 3816 at *10-*11; *Smith*, 2007 U.S. Dist. LEXIS 60729 at *13; *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 506 (M.D. La. 2005). Other cases have involved many more supervisors, work locations, and job duties than those presented here. *See Reed*, 266 F.R.D. at 450-52 (involving nine supervisors, 100 work locations, and a multitude of job assignments and duties); *Proctor*, 250 F.R.D. at 279 (involving over 300 stores in New Mexico); *Simmons*, 2007 U.S. Dist. LEXIS 5002 at *25 (involving employees in over 100 stores in Texas); *Basco*, 2004 U.S. Dist. LEXIS 12441 at *6 (involving employees at all Wal-Mart stores in Louisiana).

In contrast to these cases, the opt-in plaintiffs here have submitted a significant amount of evidence regarding their supervisors' informal pressure not to request overtime, actual refusal to grant overtime, and explicit instruction to APD CRs how to avoid detection of "off-the-clock" work. These practices amount, in our estimation, to evidence of a "policy-to-violate-the-policy." *Thompson*, 2009 U.S. Dist. LEXIS 3816 at 2. Indeed, off-the-clock hours were not simply "sporadic violations arising out of individual circumstances," but rather violations "stemming from a common impetus." *Smith v. T-Mobile USA, Inc.*, No. CV-05-5274, 2007 U.S. Dist. LEXIS 60729, *13 (C.D. Cal. Aug. 15. 2007); *see also Hill v. Muscogee Cnty. Sch. Dist.*, No. 4:03-cv-60, 2005 U.S. Dist. LEXIS 35725, *13 (M.D. Ga. Dec. 20, 2005) (refusing to decertify a class of

teachers who were "subjected to the same practice of being assigned work consistent with their regular job duties that could not be completed within their scheduled hours").

### 2.   Individualized Defenses

Farmers argues that decertification is necessary because of the highly individualized nature of its defenses, which include each plaintiff's knowledge of Farmers' policies, whether each plaintiff was paid for overtime work, whether plaintiffs' off-the-clock activities were compensable work, whether some of the off-the-clock work was *de minimis*, whether Farmers had actual or constructive knowledge of any off-the-clock work performed by the plaintiffs, whether Farmers acted in good faith, and whether the plaintiffs' claims are time-barred. However, the Court agrees with Mahoney that, based on the current record, these defenses can be adequately raised at a trial involving representative testimony. Courts have allowed the use of representative testimony in cases involving allegations of unpaid overtime. *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946); *Schultz v. Capital Intern. Sec., Inc.* 466 F.3d 298, 310 (4th Cir. 2006); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages"); *Reich v. Gateway Press*, 13 F.3d 685, 701-02 (3d Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 829 (5th Cir. 1973) (allowing representative testimony in a case involving unpaid overtime); *Thiebes v. Wal-Mart Store, Inc.*, 2004 U.S. Dist. LEXIS 15263, *1 (D. Or. July 26, 2004); *National Electro-Coatings, Inc. v. Brock*, No. C86-2188, 1988 U.S. Dist. LEXIS 16937, *8 (N.D. Ohio July 13, 1988) ("Courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers."). The Court similarly finds that Defendants will be

allowed to raise all of its asserted defenses by examining representative plaintiffs and presenting its own evidence at trial.

Furthermore, the Court believes that Farmers' concern over the extent to which each plaintiff may have been paid for overtime hours can be resolved through bifurcation of the trial into a liability stage and a damages stage. *See Thiebes v Wal-Mart Store, Inc.,* No. Civ. 98-802-KI, 2004 U.S. Dist. LEXIS 15263, at *1 (D. Or. July 26, 2004) (noting that the court had bifurcated collective action involving allegations of unpaid overtime and off-the-clock work into separate liability and damages trials). The liability stage will focus on the class-wide question of whether Farmers knew or should have known that APD CRs were working off-the-clock to comply with their supervisors formal and informal instructions to work overtime hours without requesting overtime payment. If liability is proven, the amount of off-the-clock hours, the amount each plaintiff may have been paid for overtime work, and the extent to which off-the-clock work can be attributed to reasons other than Farmers' policies can be evaluated at damages phase of trial.

### 3.      Fairness and Procedural Considerations

Defendants contend that a collective proceeding would be unmanageable and prejudicial due to the varying amounts of overtime that each plaintiff may have worked, the varying factual situations of each plaintiff, and the inability to use representative testimony during trial. In evaluating fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity. *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 U.S. Dist. LEXIS 44259, *7 (S.D. Tex. Aug. 17, 2005). However, "the Court must

also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Id.* (citation omitted).

The Court is convinced that fairness considerations militate in favor of allowing this lawsuit to proceed collectively. Decertifying this class would be contrary to both of the purposes of Section 216 of the FLSA. First, given the substantial similarity of the putative class members claims, it certainly would not be in the interest of judicial economy to require the claims to be adjudicated in individual trials. Furthermore, the FLSA is a remedial statute, *see, e.g., Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 329 (5th Cir. 1993) (recognizing FLSA's remedial purposes); *Prickett v. Dekalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003) (per curiam) ("FLSA is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction" (internal citations removed)), and the Supreme Court has acknowledged that Congress intended to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffman-LaRoche Inc. v. Sperling,* 493 U.S. 165, 170 (1989). As the district court in *Bradford v. Bed Bath and Beyond* noted, plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action." 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002). Although the remedial nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively, it does at least suggest that a close call as to whether Plaintiffs are similarly situated should be resolved in favor of certification.

As for Defendants' concerns over the extent to which any particular plaintiff worked overtime and may have been compensated for that time, we believe that bifurcation of trial into liability and damages phases may solve this issue. With respect to representative testimony, we do not believe that the plaintiffs' experiences are so factually distinct that one or a few plaintiffs

may not stand in for the rest of the class. We are also willing to entertain the creation of sub-classes according to office to solve some of the manageability concerns, though we emphasize that common experiences of APD CRs vis-à-vis their supervisors' pressure to work off-the-clock does not seem to vary widely from office to office. The Court therefore concludes that fairness considerations do not support decertification.

### C.    Remote Synchronization

Mahoney points to Farmers' requirement that APD CRs remotely synchronize their computers before or after their shifts as another common policy or plan resulting in off-the-clock work by APD CRs. In response, Farmers contends that plaintiffs had widely different experiences regarding sync time: some never needed to remote sync, while others only remote synced once or twice per week, and yet others remote synced during their shifts and were paid for that time.

Our review of Mahoney's evidence demonstrates that the APD CRs were similarly situated in that they were required to conduct a remote synchronization of their computers at home, outside of their scheduled shifts, that resulted in off-the-clock work.[71] Specifically, the opt-in plaintiffs testified that they were told to sync their computers in the morning and the nighttime.[72] Generally, they remotely synced their Farmers-issued laptops at home.[73] In order to do so, they turned on their computer and connected to the Farmers Network through a VPN program.[74] They pressed a button on their computer to begin the synchronization.[75] The

---

[71] Although Cook testified that he did not have to sync his computer, he also states that he appeared to be the "only person" who did not have to. (Cook Dep. 15:21-16:3.)

[72] Mahoney Dep. 135:10-11; McElveen Dep. 79:24-80:18 (was told by supervisors to perform remote sync in the morning before getting ready for the day); Novak Dep. 26:20-23 (was told by Farmers to perform the remote sync before the day and at the end of the day); Palm Dep. 129:4-11 (was told by supervisor to perform remote sync "after hours"). Though St. Germain did not remote sync at home, he did remote sync before his shift started, during non-compensated hours. (St. Germain Dep. 72:5-75:2.)

[73] Austin Dep. 31, 32; Barboa Dep. 30:10; Bilbrey Dep. 30:6; Cash Dep. 17:18-20; McElveen Dep. 75:6-13; Mumford Dep. 25:12-21; Skiff Dep. 74:17-20.

[74] Austin Dep. 32; Barboa Dep. 37; McElveen Dep. 82; Novak Dep. 20:6-14.

[75] Austin Dep. 32; Barboa Dep. 37; Jones Dep. 110; McElveen Dep. 82; Mumford Dep. 30; Palm Dep. 128.

synchronization process could take anywhere from 15 minutes to three hours.[76] Although some

plaintiffs attempted to do other work while the synchronization process occurred, they had to

continuously monitor the computer since synchronization process frequently failed.[77] If the

synchronization process failed and the APD CR had to restart the process, the entire process

could take three to four hours to complete.[78]

Mahoney has demonstrated through the testimony of the opt-in plaintiffs that the APD

CRs are similarly situated in that they were required to synchronize their computers outside of

their scheduled shifts. Although no formal, written policy existed, the experiences of the opt-in

plaintiffs demonstrates that Farmers imposed a *de facto* policy necessitating computer

synchronization to take place before or after the workday. Although there are certain APD CRs

who did not remotely sync and some who remote synced at the office (though they also remote

synced at home),[79] these individuals appear to be outliers to the common practice of remote

synchronization each day at home. Though different opt-in plaintiffs synced at different times and

---

[76] Austin Dep. 31-33, 36 (process took anywhere from 1-3 hours once or twice per week); Barboa Dep. (process took 15-30 minutes daily); Bilbrey Dep. 41:7-16, 76:17-21 (process took one and one-half to two hours in the morning and thirty minutes to two hours in the evening); Cash Dep. 18:13-15 (process took an hour to an hour and a half); Fudge Dep. 100:18-101:7 (process took 30-60 minutes each night); Jones Dep. 120:22-24 (sync took at least one and a half hours, but could take all night); Mahoney Dep. 70:21-22 (sync took anywhere from 30 minutes to two and a half hours); McElveen Dep. 76:24-77:12 (remote sync took anywhere from 15-30 minutes depending on how recently the previous sync had been performed); Mumford Dep. 29:8-18 (remote sync process took thirty minutes to one hour); Novak Dep. 37:6-7 (remote sync process at night took an hour and a half); Palm Dep. 128 (remote sync process took up to two hours); Skiff Dep. 76:16-18 (remote sync process took about 40 minutes on average); St. Germain Dep. 73:25-1 (remote sync process took about 5-10 minutes in the morning).

[77] Austin Dep. 36 (looked at computer regularly to make sure it hadn't locked out); Barboa Dep. 37-38 (had to monitor the computer because the VPN would boot him off); Bilbrey Dep. 30:6-7, 43:10-18, 77:2-78:18 (movements during remote sync were "restricted" because he needed to monitor the computer); Cash Dep. 18:17-18, 45:12-14 (had to monitor sync process every 10 to 15 minutes); Fudge Dep. 52:6-13 (monitored sync process at night until he went to bed); Jones Dep. 59:1-7, 120 (constantly getting kicked of VPN during synchronization); Mahoney Dep. 72:7-9 (monitored screen throughout synchronization to make sure it occurred); McElveen Dep. 81:1-83:5 (always had to be "vigilant" during remote sync process because it frequently disconnected); Mumford Dep. 25:12-21, 30-31, 60-61 (could not walk away from computer during sync process); Novak Dep. 20:6-14, 37 (checked on computer every 15 minutes); Palm Dep. 128-132 (had to keep an eye on remote sync process because it would disconnect).

[78] Bilbrey Dep. 78:16-18; Cash Dep. 18:13-15 (process took an hour to an hour and a half, but he would have to restart process if he lost connection).

[79] Cook Dep. 15:21-16:3 (did not have to remote sync at all); St. Germain Dep. 36:1-7 (remote synced his laptop at the office sometimes); McElveen Dep. 83:22-84:5 (in addition to the remotely sync twice per week at home, he sometimes remote synced at the office).

different frequencies during the week,[80] these differences are relevant to the amount of overtime accrued rather than whether or not plaintiffs were required to work off-the-clock. In addition, these differences can be addressed at a damages phase of trial, when each plaintiff may present evidence regarding the amount of "off-the-clock" hours he or she worked. Ultimately, the basic practice of remote synchronization varies little among Farmers' offices and among the opt-in plaintiffs. Thus, there are few material differences among the opt-in plaintiffs factual and employment settings that would suggest collective action of the plaintiffs' remote synchronization "off-the-clock" hours is inappropriate.

With respect to individualized defenses, Farmers interposes a number of defenses it claims cannot be adjudicated on a collective basis. However, each of these defenses can be adjudicated for the class as a whole. For example, Farmers does not consider the remote synch process to be compensable work because APD CRs are free to carry out personal activities during the process. Yet this defense is not specific to a particular plaintiff and can be adjudicated on the basis of representative testimony from the opt-in plaintiffs regarding the sync process. *See Underwood v. NMC Mortgage Corp.*, No. 07-2268-EFM, 2009 U.S. Dist. LEXIS 39743, *12-*13 (D. Kan. May 11, 2009) (when defendant has same defense to every plaintiff's claim, common issues predominate); *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. 06-299-JBC, 2008 U.S. Dist. LEXIS 56089, *37-*38 (E.D. Ky. July 22, 2008) (same).

As for Farmers' defense that sync time is *de minimus*, Farmers can certainly use the testimony of certain opt-in plaintiffs to demonstrate the range of time spent on remote

---

[80] Bilbrey 35:12-16, 76:13-14 (remote synced at the beginning and at the end of each day); Cash Dep. 17:18-20, 41:22-23 (remote synced at the beginning and end of each day); Fudge Dep. 52:6-13 (remote synced every night); Jones Dep. 110:8-10 (remote synced every morning); Mahoney Dep. 68:24-69:4, 131:2-132:15 (remote synced every weekday morning and some nights); McElveen Dep. 75:6-13 (remote synced approximately twice per week in the morning); Mumford Dep. 25:12-21, 36:18-25 (remote synced every morning and every night); Novak Dep. 20:5-14, 37 (remote synced every morning and night); Palm Dep. 102:3-8 (remote synced once or twice per week); Skiff Dep. 74:17-20, 75:18-21 (remote synced every night); St. Germain Dep. 72:5-9 (remote synced in the morning or the night before).

synchronization and argue to the jury that the lower range of time is *de minimus*.  As for Farmers'

other defenses, including whether an opt-in plaintiff was paid for off-the-clock work, the alleged

lack of notice to Farmers of the off-the-clock work, the good faith of a particular manager, and

whether any plaintiff's claims are time-barred, these can be handled either through bifurcation of

the trial into liability and damages phases or by dividing the APD CRs into subclasses according

to office.

Finally, fairness and procedural considerations counsel against decertification. Each opt-in

plaintiff's individual claim for uncompensated overtime hours may not be worth pursuing

individually, but bundled together, the class appropriately receives the advantages of a collective

action. The use of representative testimony would not prejudice Farmers because of the extreme

similarly among the opt-in plaintiffs' remote synchronization experiences. In addition, the

similarity among the opt-in plaintiffs' experiences indicates that testimony from many

representatives would not be necessary and trial of this issue would be manageable. Thus, we

conclude that decertification would be inappropriate here.

## IV.    CONCLUSION

Defendant's Motion to Decertify FLSA Collective Action (Doc. No. 85) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this the 22nd day of September, 2011.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE